**METAL PROCESSORS' UNION LOCAL NO. 16, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Poray, Inc., Intervenor.

No. 18194.

United States Court of Appeals District of Columbia Circuit.

Argued March 25, 1964.

Decided June 18, 1964.

Mr. Mozart G. Ratner, Washington, D. C., with whom Mr. Robert M. Lichtman, Washington, D. C., was on the brief, for petitioner.

Mr. Stephen B. Goldberg, Attorney, National Labor Relations Board, of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Harold B. Shore, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. Warren G. Sullivan, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of

court, with whom Mr. Clarence G. Pechacek, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, Chief Judge, and. BASTIAN and McGOWAN, Circuit Judges.

BASTIAN, Circuit Judge.

On August 13, 1962, petitioner, Metal Processors' Union Local No. 16, AFL-CIO (Union), filed with respondent, National Labor Relations Board, a charge of unfair labor practices against intervenor, Poray, Inc. (Company), in violation of the National Labor Relations Act, as amended, 61 STAT. 136 (1947). Appropriate proceedings were instituted, culminating in the Board's dismissal of the complaint. The case is now before us on a petition to review and set aside the order of the Board. The stipulated questions for our decision are:

"Whether the Board properly dismissed those portions of the complaint alleging:

"(1) That employee Stanley Jasinski was discriminatorily not recalled to work following his layoff, in violation of Section 8(a) (3), (4) and (1) of the Act;

"(2) That employee John Zajac was discharged because of his Union activities, in violation of Section 8. (a) (3), (4) and (1) of the Act; and

"(3) That the employer, Poray,. Inc., violated Section 8(a) (1) of the Act through the speeches of its President and Vice President on September 7, 1962."

I

With regard to Jasinski, the trial examiner found him to be one of a large number of workers laid off by the Company on June 25, 1962, for valid economic reasons. While Jasinski was recalled on September 13, 1962, the general counsel alleged that the Company's refusal to recall him at an earlier date was discriminatory. At the hearing Jasinski testified that when he was at the plant on July 10, 1962, in an unsuccessful effort to

get back to work, he saw two new employees working in the shear department, where he had worked. The entire thrust of the general counsel's argument at the hearing centered about the July 10th incident.

In his intermediate report, the examiner stated:

> "The documentary evidence introduced by General Counsel did not tend to support Jasinski's testimony that men junior to him were employed at his job on July 10. * * * The payroll dated July 20, covering the week of July 9 through July 15, indicates that the shear department was still shut down. * * *
>
> " * * * I find that Jasinski was not discriminated against on July 10. * * * "

With this finding the Board agreed.

■ On the basis of a further examination of the documentary evidence, the examiner also determined that at a later date one Ortiz was recalled ahead of Jasinski, although Ortiz was junior in employment. This, the examiner found, constituted discrimination violative of the Act. The Board, however, in the ruling challenged here, stated:

> "A review of the record demonstrates that the conclusion drawn by the Trial Examiner was based upon a set of unlitigated facts separate and apart from those upon which the General Counsel had premised the allegation. Accordingly, we shall dismiss that portion of the complaint alleging a violation of the Act as to Jasinski."

An examination of the record sustains the Board's position. The only issue litigated at the hearing was whether Jasinski had been discriminated against on July 10, the day he allegedly saw two new men working in the shear department. Neither Ortiz's name nor the fact that he was working in the shear department on the date Jasinski was recalled was adverted to in the complaint or at the hearing. Ortiz was not called to testify. Further, there was no claim in the general counsel's brief to the trial examiner that Ortiz had been discriminatorily recalled prior to Jasinski. In fact, the first appearance of this theory was in the trial examiner's intermediate report. It seems clear, therefore, that the Company had no opportunity to explain why Ortiz was working when Jasinski was recalled. We cannot agree with petitioner that the mere introduction of payroll records and seniority lists covering the period June 25, 1962, to September 13, 1962, was sufficient notice to the Company that Ortiz's presence was being relied on as a basis for the charge of discrimination.[1] Accordingly, it would have been wholly unfair to the Company for the Board to have ruled on the merits of this theory.[2]

## II

■■ The Union next argues that the Board erred in dismissing the charge that Zajac's discharge was discriminatory. In the proceedings before both the trial examiner and the Board, the general counsel contended that the Company discriminatorily applied a valid company rule prohibiting smoking in the plant where Zajac worked, under penalty of

1. It should be noted further that, at the time of the situation complained of, the collective bargaining agreement in effect between the Company and the Union stipulated that both skill and the ability efficiently to perform the required work were to be considered prior to length of service or seniority in determining employment rights in layoffs and recall. Hence it would seem that Ortiz's mere physical presence would not in itself establish a deviation from seniority policy violative of the Act.

2. Cf. N.L.R.B. v. Johnson, 322 F.2d 216, 220 (6th Cir. 1963) ; Waukesha Sales & Service, 137 NLRB 460, 461–62 (1962) ; Local Union 41, Sheet Metal Workers, 136 NLRB 787, 789 (1962) ; Stokely-Van Camp, Inc., 130 NLRB 869, 872–73 (1961). See N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 431–432, 61 S. Ct. 693, 85 L.Ed. 930 (1941) ; N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U. S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1937).

discharge if violations of the rule occurred three times within a calendar year. Zajac, admittedly, had been caught smoking on three separate occasions in a single year by foreman Frank Blaha, and had been given a warning notice each time. The Board stated:

"The trial examiner found that known violations of the no-smoking rule were widespread and that the rule was unfairly applied to Zajac, relying upon the testimony of seven employees that they continued to smoke after the inception of the 'triple warning system' in March 1962. He further found that several of these employees were seen smoking by their foremen and were 'merely' warned not to get caught smoking but were not given written notices. However, the record shows that only two of the seven worked in the same plant as Zajac, and these two testified that they smoked only in the washrooms, where they were careful to hide the fact of their smoking, and were never caught smoking by any responsible official of the Respondent. The other five employees, who worked in a plant other than the one in which Zajac was employed, smoked in a lunch area where smoking apparently was not forbidden during the lunch period. In addition, contrary to the Trial Examiner, the record is not clear whether the warnings that were given in the other plant not to get caught smoking came at times when the particular employees were smoking, or, if they were, whether they were smoking illegally. Therefore, while Zajac was the only employee discharged pursuant to the rule, it is difficult to say that he was a victim of discrimination in the absence of evidence that other employees were treated differently."

The record again sustains the Board. No evidence appears to indicate Company hostility toward Zajac, either during the period that he was a Union steward or during the short time prior to his discharge that he was chief steward. He met frequently with his foreman, Blaha, to discuss employee grievances; Zajac himself indicated that differences between them were amicably worked out. In addition, there was no evidence that Blaha had overlooked violations by other employees and had enforced the rule only as to Zajac. Moreover, it seems clear that an inference that Zajac was discharged on account of his Union activities may not be drawn from the mere fact that the activities preceded the discharge.[3]

■■ The Union argues further that the Board erred in rejecting certain evidence which, it is said, established general Company hostility toward the Union, from which, in turn, it may be inferred that Zajac's discharge was discriminatory. With this we cannot agree. Even if it were assumed *arguendo* that the evidence referred to did establish general Company animosity toward the Union, it would be insufficient in itself to ground the inference that Zajac's discharge was violative of the Act. As the court in N. L. R. B. v. Redwing Carriers, Inc., 284 F.2d 397, 402 (5th Cir. 1960), observed:

"The opposition of an employer to union organization and even unlawful interference are not enough without more to make the discharge of an employee wrongful. N. L. R. B. v. Hudson Pulp & Paper Corp., 5 Cir., 273 F.2d 660; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406."[4]

3. Cf. N.L.R.B. v. United Brass Works, 287 F.2d 689, 693 (4th Cir. 1961); Tampa Times Co. v. N.L.R.B., 193 F.2d 582, 583 (5th Cir. 1952). See also N.L.R.B. v. Milwaukee Elec. Tool Corp., 237 F.2d 75 (7th Cir. 1956); John S. Barnes Corp. v. N.L.R.B., 190 F.2d 127 (7th Cir. 1951).

4. Cf. N.L.R.B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 514 (6th Cir. 1964); Peoples Motor Express v. N.L.R.B., 165 F.2d 903, 907 (4th Cir. 1948).

We do not agree with petitioner that Wallace Corp. v. N.L.R.B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944) re-

### III

■ With regard to speeches made to the employees on September 7, 1962, by the Company's president, Poranski, and vice president, Golterman, the Board stated:

"In his speech the Vice-President warned the employees that in view of [the Company's] economic condition a strike would 'automatically' result in the permanent closing of the [Company's] plant. In addition, he told the employees that the plant was a job-shop working on goods belonging to its customers rather than to the [Company] and that the customers would remove their dies in case of a strike. The President's speech, when read in its entirety, was in a similar vein. We find that these speeches were not coercive or intimidatory and that they did not exceed the bounds of Section 8(c) of the Act. Accordingly, we shall dismiss that portion of the complaint alleging that the [Company] violated Section 8(a) (1) of the Act by these speeches."

The Union argues that the Board's ruling is inconsistent with our decision in Int'l Union of Elec., Radio & Mach. Workers v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757 (1960). We disagree. In *I. U. E.*, we reversed the Board's finding that it was not a violation of Section 8(a) (1) of the Act for a supervisor to tell employes that union organization of the employer's plant would result in the loss of the employer's two biggest customers and a consequent reduction in employees' working time. There we observed:

"No evidence was adduced at the hearing to support that assertion or to show any basis for the supervisor's belief in its truth. Nor does it appear that the basis was so widely known that the employee may fairly be presumed either to have known it or to have been able to discover it. * * * It seems clear that Congress did not intend to protect an unqualified assertion of such importance unless the utterer can show that he had some reasonable basis for it. * * *

" * * * [The Act does not] confer a license to make an assertion of a specific and critical fact which is drawn from thin air." 110 U.S. App.D.C. at 114, 289 F.2d at 763.

In this case, however, it cannot be said that the assertions by the Company officials were without "reasonable basis" or that they were "drawn from thin air." As Golterman stated, the Company was a job-shop and the dies used in its operations were received from customers who had removed them from strike-bound competitors of the Company. There was no reason to suppose the Company's customers would not take the same action if it were struck. Moreover, a certified annual report of the Company, which had been shown to the Union, demonstrated the Company's precarious financial situation. Thus Golterman's expression of doubt that the Company could survive a strike and remain in business was not without some foundation in fact—cir-

---

quired the Board to look behind a prior settlement agreement between the Company and the Union, and to consider the Company's conduct prior to the date of the agreement. First, *Wallace* does not limit the Board's discretion as to when it will survey company activities antedating a valid settlement agreement. Second, a close reading of the *Wallace* opinion and the cases there cited clearly indicates that the Board practice of considering pre-settlement acts of a party had been restricted to situations where subsequent conduct of one of the parties had violated or frus-

trated the terms or purposes of the earlier settlement agreement; factually, most of the cited cases involved consent elections and subsequent conduct interfering with the effectuation of the elections or unionization. In view of the general Board policy not to "look behind" valid settlement agreements approved by the Board, Matter of Corn Products, 22 NLRB 824, 828–29 (1940), we feel the Board's rejection of the pleadings in the prior proceedings was not improper notwithstanding the unfortunate use of judicial procedural language by the Board.

cumstances of which the Union was also aware. Furthermore, as a practical matter, it would seem that a company's ability to calculate the detrimental financial consequences of a strike is far more reliable than is its speculation regarding adverse economic results from mere unionization of its employees. We think the statements involved here are not within the category proscribed by *I. U. E.*, and that the record sustains the Board's decision on this point.[5]

We are of the opinion, therefore, that on the entire record there is substantial evidence supporting the Board's order dismissing the complaint. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). Accordingly, the petition to set aside the Board's order is

Denied.

5. Cf. N.L.R.B. v. Transport Clearings, Inc., 311 F.2d 519, 523–524 (5th Cir. 1962); Union Carbide Corp. v. N.L.R.B., 310 F. 2d 844 (6th Cir. 1962).